UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ROLL-RITE, LLC,

                          Plaintiff,                          Case No. 12-cv-11150
v                                                            Honorable Thomas L. Ludington

SHUR-CO, LLC,

                          Defendant.

_____/

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT, DENYING MOTION TO EXCLUDE EXPERT TESTIMONY, AND RESCHEDULING PRETRIAL AND TRIAL DATES**

Plaintiff Roll-Rite holds U.S. Patent No. 5,829,819 (the "'819 patent"), which encompasses the use of a gear motor in an electric tarp system. Roll-Rite claims that Defendant Shur-Co infringed its '819 patent and seeks to recover damages in the form of lost profits.

Shur-Co has moved to exclude the testimony of Roll-Rite's damages expert, contending that it is "incomplete, calculated to mislead the jury and based on unreliable methodology". However, because the expert testimony satisfies the requirements of Federal Rule of Evidence 702, Shur-Co's motion to exclude will be denied.

Shur-Co has also moved for summary judgment on two issues: first, that Roll-Rite cannot maintain a claim of infringement because Shur-Co's product does not meet all the requirements of the claim construction, and second, that Roll-Rite is not entitled to lost profits. Roll-Rite has produced sufficient evidence to survive summary judgment on these claims, and therefore Shur-Co's motion will be denied.

**I**

Roll-Rite produces gear motors for an electric tarp system for use on open-top vehicles, such as dump trucks. The tarp is stored on a spool attached to a shaft and driven by a motor. When the motor is energized, it drives a shaft that rotates the spool, thereby winding or unwinding the tarp. When the motor is turned off, a brake engages and locks the tarp in place.

Roll-Rite applied for a patent on the tarp system's gear motor in 1997. After initially rejecting the application, the Patent and Trademark Office issued U.S. Patent No. 5,829,819. Entitled "Electric Tarp System for Truck Bed," the '819 patent contains three independent claims (claims 1, 9, and 17) and seventeen dependent claims. Roll-Rite claims that Shur-Co has infringed independent Claim 1 and dependent Claim 8.[1] Claim 1 provides:

> 1. A direct-drive actuator assembly for actuating a tarp spool for a truck bed tarp system, the direct-drive actuator assembly comprising:
>
> a transmission housing having an output shaft for directly driving the tarp spool, and further having transmission gears therein engaging the output shaft;
>
> an electric motor operatively connected to the transmissions gears for actuating the tarp spool; and
>
> a brake operatively connected to the electric motor for automatically braking the motor when the electric motor is turned off.

'819 patent., col. 4, ll. 50-61. As a dependent claim, Claim 8's definition builds off of Claim 1's definition: "The direct-drive actuator assembly of claim 1, wherein the electric motor comprises a DC motor." '819 patent, col. 5, ll. 17-18.

**A**

In 2006, Roll-Rite began selling the '819 gear motors to Shur-Co for use in Shur-Co's Series 3500 tarp systems. Knight Decl. at 7; Krajewski Dep. at 19, 33. Shur-Co would then sell

---

[1] Roll-Rite originally asserted that Shur-Co had infringed claims 1, 2, 3, 8, 17, and 18 of the '819 patent. Roll-Rite has since dropped its assertion of infringement of claims 2, 3, 17, and 18, leaving only claims 1 and 8 in the case. Mot. Summ. J. 4 n. 1.

the Series 3500 electric tarp systems to its customers, approximately 50% of whom were in the agricultural market. Krajeski Dep. at 17, 34. When Shur-Co began selling electric tarp systems for use in agricultural trailers in 2006, it had only one other competitor in the agricultural market—Aero Industries. Since that time, the market for electric tarp systems has expanded, and Shur-Co now competes against at least six other electric tarp system manufacturers. Krajewski Dep. 35; Tennant Dep. 41.

Roll-Rite, however, does not directly compete in the complete tarp system market; instead, it provides component gear motors for manufacturers of tarp systems. Bartell Dep. at 15 ("We sell just motors . . . ."); Krajewski Dep. at 35. Indeed, Shur-Co was Roll-Rite's "primary distribution in terms of the motors into [the agricultural market]." Krajewski Dep. at 35. Although Shur-Co no longer purchases Roll-Rite's gear motors, Roll-Rite continues to provide gear motors to Shur-Co's competitors in the electric tarp system market. Moreover, Shur-Co contends that the demand for tarp systems is increasing: "I think we're all rising with the tide. I think the demand is greater and that everyone's business should be benefitting from it." Tennant Dep. 43.

At some point, Shur-Co began experiencing problems with Roll-Rite's gear motors. Shur-Co reported that "brakes and gear cases [were] cracking" and "motor[s] melted." Kartes Dep. 92. In addition, "Shur-Co made up 40.5% of the returns for melted motor return for all motors invoiced and returned [to Roll-Rite] in 2007." Def.'s Mot. to Exclude, Ex. B. As a result of these issues, Shur-Co had a return rate that was 4.4 times that of other purchasers in 2007. *Id.*

**B**

Because of these problems, Shur-Co "felt it was in Shur-Co's best interest to pursue our own motor design . . . ." Pl.'s Resp. to Mot. to Exclude, Ex. 8. In 2010 Shur-Co retained

Groschopp, a manufacturing company, to produce a gear motor for use with a tarp system. Oosterhuis Decl. ¶ 5. Groschopp developed and began producing a gear motor that Shur-Co used in its 4500 Series tarp systems. *Id.* at ¶ 6-7. The designers knew of Roll-Rite's patented gear motor, and they sought to design a new gear motor that would not infringe Roll-Rite's gear motor. Knight Decl. ¶ 10-11. In particular, the "braking system of Shur-Co's new gear motor was specifically designed to avoid infringement" of Roll-Rite's patent. *Id.* at ¶ 11.

The 4500 Series gear motor uses a series of stationary, permanent magnets and ferrous elements to complete a magnetic field. Knight Decl. at ¶ 15. That magnetic field provides resistance to the rotational movement of the motor shaft, which prevents the gear motor from turning the tarp spool. *Id.* at ¶ 16. When enough power is supplied to the motor, the motor shaft's rotational movement can overcome the resistance, allowing the tarp to roll and unroll. *Id.* at ¶ 19.

In other words, the magnets provide a magnetic field that resists the rotational movement of the motor shaft. The magnetic field provides continuous resistance, regardless of whether electrical power is being supplied to the motor and the shaft it drives. And it is only when the motor is provided with enough power that the shaft's resistance to turning can be overcome, thereby rolling the tarp.

Shur-Co explains that using a magnetic field to resist rotational movement provides several significant advantages over Roll-Rite's gear motors: Shur-Co's 4500 Series does not need electricity to operate, the 4500 Series requires fewer individual moving components, and the 4500 Series is cheaper to manufacture. Knight Decl. ¶ 29-31.

The 4500 Series's design does have its disadvantages, though. Most notably, the 4500 Series gear motor is less efficient than gear motors that lack permanent magnets, such as Roll-

- 4 -

Rite's gear motors.  Because the magnetic field provides continuous and substantial resistance to rotational movement, it requires about twice as much power to overcome that resistance.  "Tests show that the motor needs a current of (5.4 amps) to maintain the rotational speed of the motor shaft [i.e., wind and unwind the tarp] . . . . With the magnets removed, only about half the current (2.67 amps) is needed to rotate the motor shaft . . . ."  Knight Decl. ¶ 24-25; Smith Decl. ¶ 38.  Accordingly, "[t]his reduces the efficiency of the 4500 Series gear motor . . . ."  Knight Decl. ¶ 46.

In late 2011, Shur-Co began selling the 4500 Series tarp systems that utilized Groschopp's new gear motor.  Knight Decl. ¶ 8.  Thus, while Shur-Co had once been Roll-Rite's customer, Shur-Co now uses its own newly-designed motor in the 4500 Series.

In 2012, Shur-Co applied for a patent for the newly-designed gear motor used in their 4500 Series tarp systems.  *Id.* ¶ 13-14; Pl.'s Resp. to Mot. to Exclude, Ex. 7.  As of December 17, 2013, Shur-Co's patent application was still pending before the United States Patent and Trademark Office.  Knight Dep. at 54.

## II

Shur-Co has filed two motions with the Court.  First, Shur-Co moves to exclude the testimony of Roll-Rite's damages expert.  Shur-Co contends that the proposed expert testimony does not satisfy the requirements of Federal Rule of Evidence 702 because the expert's testimony is "incomplete, calculated to mislead the jury and based on unreliable methodology."  Mot. to Exclude 6.

In addition, Shur-Co has also filed a motion for summary judgment on Roll-Rite's claims for infringement and lost profits.  Shur-Co asserts that Roll-Rite cannot prove infringement because Shur-Co's allegedly infringing device—the 4500 Series—does not meet each and every

claim of the '819 patent.  Moreover, Shur-Co continues, even if the 4500 Series is infringing, Roll-Rite is not entitled to lost profits because it cannot demonstrate that "but for" Shur-Co's infringement, it would have sold additional patented gear motors.

### A

Shur-Co moves to exclude the proposed expert testimony of John Bone on the issue of patent infringement damages.  Mr. Bone is a Certified Public Account and is Certified in Financial Forensics.  Expert Report at 5.  Mr. Bone has "served as an expert witness or served as a consultant" in a myriad of cases over the last 25 years, and "most included an analysis and evaluation of economic and financial data for the purpose of determining the extent of damages." *Id.*  Using the analysis set forth in Panduit, Mr. Bone's expert report purports to estimate the lost profit damages Roll-Rite incurred due to Shur-Co's infringement.

Mr. Bone concluded that "[a]s a result of Shur-Co's infringement, Roll-Rite suffered lost profits amounting to approximately $167 for each Super Duty [gear motor] and approximately $164 for each TarpStretcher [gear motor] lost in 2012 and approximately $153 for each Super Duty [gear motor] and approximately $150 for each TarpStretcher [gear motor] lost in 2013." Expert Report at 6.  Mr. Bone reached this conclusion based on the "demand for the patented technology, the absence of acceptable non-infringing substitutes, Roll-Rite's marketing and manufacturing capabilities, and the availability of information sufficient to quantify lost profits . . . ." *Id.*

### i

Federal Rule of Evidence 702 provides that an expert witness with "scientific, technical, or other specialized knowledge" may testify in the form of an opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Moreover, *Daubert v. Merrell Dow Pharmaceuticals* requires that the trial judge determine "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can properly be applied to the facts at issue." *Daubert*, 509 U.S. at 592-593 (1993). To aid the trial court in making this determination, the *Daubert* Court provided a list of non-exclusive factors to consider, including:

> (1) whether the scientific theory or technique can be (and has been) tested;
>
> (2) whether the theory or technique has been subjected to peer review and publication;
>
> (3) whether there is a known or potential error rate; and,
>
> (4) whether the theory or technique is generally accepted within the relevant scientific community.

*Daubert* at 592-594.

"Thus, trial judges are responsible for determining whether the knowledge of the expert, whether scientific, technical, or specialized, is based upon the application of reliable theories or techniques. The proponent of the testimony must establish admissibility by a preponderance of the evidence." *DSU Medical Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1146 (N.D. Cal. 2003) (citing *Bourjaily v. United States*, 483 U.S. 171, 175–176 (1987)).

Furthermore, the Supreme Court has held that, in cases involving non-scientific testimony, district courts are not limited to the *Daubert* factors in assessing the reliability of the proffered testimony. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 150-151 (1999). Rather, they enjoy broad discretion in determining both how to assess reliability and whether it exists. *Id.*

Notwithstanding that broad discretion, in determining the reliability of expert testimony, the trial court is limited to considering the methodologies relied upon by the expert, rather than the conclusions reached by such expert. *United States v. Bonds*, 12 F.3d 540, 563 (6th Cir. 1993). "It is not the trial court's role to determine whether the expert's conclusions are actually correct." *Id.* Instead, the trial court's purpose is to determine the reliability of a particular expert's opinion through a preliminary assessment of the methodologies supporting such opinion. *Daubert*, 509 U.S. at 692-93. If a trial court finds that "there is simply too great an analytical gap between the data and the opinion proffered," then the evidence may be excluded. *General Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).

Shur-Co claims that Mr. Bone's testimony regarding lost profit damages should be excluded because the testimony is "incomplete, calculated to mislead the jury and based on unreliable methodology." Mot. to Exclude 6. The cornerstone of Shur-Co's motion is that Mr. Bone failed to take into consideration the effect Shur-Co's 4500 Series had on the hypothetical market.

More specifically, Shur-Co claims that Mr. Bone's damages testimony should be excluded for three reasons: (1) Mr. Bone failed to accurately reconstruct the market; (2) Mr. Bone's report fails to establish the first and fourth Panduit factors, which are required to show that the infringement was the "but for" cause of the lost profits; and (3) Mr. Bone's report fails to opine as to the number of gear motors Roll-Rite would have sold absent infringement.

**ii**

Regarding Shur-Co's first two claims, the Federal Circuit has explained that, to establish lost profit damages, the patent owner must "reconstruct[] the market, as it would have developed absent the infringing product, to determine what the patentee would have made." *Grain*

*Processing* 185 F.3d 1341, 1350 (internal quotation marks omitted).  Indeed, "[r]econstructing the market, by definition a hypothetical enterprise, requires the patentee to project results that did not occur."  *Id.*  To avoid "lapsing into pure speculation," the Federal Circuit requires the patent owner to provide "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture."  *Id.*

The Federal Circuit has affirmed lost profits awards based on "a wide variety of reconstruction theories in which the patentee has presented reliable economic evidence of 'but for' causation."  *Crystal Semiconductor*, 246 F.3d 1336, 1355 (Fed. Cir. 2001).  Indeed, "trial courts, with [the Federal Circuit's] approval, consistently permit patentees to present market reconstruction theories showing all of the ways in which they would have been better off in the "but for world," and accordingly to recover lost profits in a wide variety of forms."  *Grain Processing*, 185 F.3d at 1350 (citing with approval cases that permitted patent owners to use the *Panduit* test to reconstruct the market).

One method of reconstructing the hypothetical market and establishing "but for" causation is to use the *Panduit* four-factor test, which Mr. Bone used to generate his expert report.  *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978), sets forth a generally-accepted four-factor test that can establish "but for" causation, thereby entitling the patent owner to lost profits.  The *Panduit* test requires that the patent owner establish the following four factors: (1) demand for the patented product; (2) the absence of acceptable non-infringing substitutes; (3) the patent owner's manufacturing and marketing capability to exploit the demand; and (4) the amount of profit the patent owner would have made.  *Panduit*, 575 F.2d at 1156.  Satisfying the *Panduit* test "permits a court to reasonably infer that the lost profits claimed were in fact caused by the infringing sales, thus establishing a patentee's prima facie

case with respect to 'but for' causation." *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995). The burden then shifts to the infringer to show that "the inference is unreasonable for some or all of the lost sales." *Id.*

Although not the exclusive means for establishing "but for" causation, the *Panduit* test is widely-used and approved method for showing causation and reconstructing the market.[2] Shur-Co does not dispute that application of the *Panduit* test is an acceptable method for reconstructing the market; instead, Shur-Co challenges Mr. Bone's substantive analysis for each *Panduit* factor.

Indeed, the cornerstone of Shur-Co's motion is that Mr. Bone failed to consider the effect of Shur-Co's 4500 Series when constructing the hypothetical market—to each *Panduit* factor, although it is most applicable to the second *Panduit* factor. Shur-Co contends that "Mr. Bone's speculation flies in the face of strong evidence showing that Shur-Co would have sold far less 3500 Series tarp systems containing Roll-Rite gear motors during the damages period" because the Roll-Rite motors had "high rates of failure[] and had a poor reputation for warranty compliance." Mot. Exclude 10. In contrast, Shur-Co's 4500 Series managed to avoid the alleged problems plaguing Roll-Rite's motors, while also incorporating additional features, such as the tarp, associated hardware, and remote control. *Id.* 11-12. Shur-Co argues that Mr. Bone should have considered these improvements when determining whether Roll-Rite would have sold just as many motors as Shur-Co did during the infringement period.

Thus, with respect to Mr. Bone's analysis of the *Panduit* factors, Shur-Co challenges Mr. Bone's conclusions, not his methodology. However, *Daubert* governs the admissibility of expert testimony only when a party challenges an expert's methodologies—not when the party

---

[2] Shur-Co's motion to exclude incorrectly separates the question of whether Mr. Bone reconstructed the hypothetical market from the question of whether the *Panduit* factors are satisfied. Because application of the *Panduit* test is itself a method of reconstructing the market, the Court will address these two issues together.

challenges an expert's substantive conclusions. Challenges to an expert's substantive conclusions, such as the ones raised by Shur-Co, are issues for a jury. Therefore, Shur-Co's challenges regarding Mr. Bone's interpretation of the *Panduit* factors could be dismissed on this ground alone. *See United States v. Bonds*, 12 F.3d 540, 563 (6th Cir. 1993). Nevertheless, the Court will examine examine Mr. Bone's *Panduit* analysis.

**a**

Mr. Bone explains that the first *Panduit* factor is satisfied because there is a demand for Roll-Rite's gear motors based on "Roll-Rite's past success in selling the Super Duty and TarpStretcher to both Shur-Co and other competitors, and continued sales volumes of direct drive actuator assemblies by Roll-Rite and Shur-Co . . . ." Expert Report at 19. Mr. Bone's explanation also finds support in the testimony of Shur-Co's employee: "I think we're all rising with the tide. I think the demand is greater and that everyone's business should be benefitting from it." Tennant Dep. 43.

Shur-Co, however, disputes Mr. Bone's explanation and claims that he has not shown there is demand for Roll-Rite's gear motors. Shur-Co alleges that Mr. Bone has failed to reconstruct the market because he "did not conduct any analysis or investigation into Shur-Co's customers who ultimately purchased the 4500 Series tarp systems from Shur-Co." Mot. to Exclude 11. Without knowing why Shur-Co's customers purchased the 4500 Series, Shur-Co argues, Mr. Bone cannot offer the opinion that Roll-Rite would have captured 100% of the 4500 Series sales. Shur-Co explains that "Mr. Bone's approach fails to consider that the 4500 Series also includes many components besides from [sic] the gear motor, such as the tarp, associated hardware, remote control, etc. that may have influenced a customer's decision to purchase the 4500 Series and not the 3500 Series." Mot. to Exclude 12. By not taking into account possible

consumer demand for parts other than the infringing feature, Shur-Co argues that Mr. Bone has not satisfied *Panduit*'s first factor.

> But investigating a consumer's reason for purchasing is not required by *Panduit*:
>
> The *Panduit* factors do not require showing demand for a particular embodiment of the patented functionality . . . . Nor does it require any allocation of consumer demand among the various limitations recited in a patent claim.

*Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1265 (Fed. Cir. 2013). "Instead, the first *Panduit* factor simply asks whether demand existed for the 'patented product,' *i.e.*, a product that is 'covered by the patent in suit' or that 'directly competes with the infringing device.'" *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1330 (Fed. Cir. 2009). More specifically, "it is not necessary for the patent holder to negate all possibilities that a purchaser might have bought a different product or might have foregone the purchase altogether." *Minnesota Mining and Mfg. Co. v. Johnson v. Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1577 (Fed. Cir. 1992).

That Shur-Co can point to evidence that identifies other drivers of demand—such as the tarp, remote controls, and associated hardware—is irrelevant in determining admissibility. Rather, these are concerns for cross-examination. Reasonable people can disagree about the driver of demand for the tarp systems, but the first *Panduit* factor as construed by the Federal Circuit requires only demand for a product that competes with the infringing device—here, Roll-Rite's gear motors. Roll-Rite, through Mr. Bone's report, has provided sufficient evidence that there is demand for a product (Roll-Rite's gear motors) that competes with the infringing device (Shur-Co's 4500 Series), thereby making a prima facie showing of the existence of the first *Panduit* factor.

**b**

Regarding the second *Panduit* factor, absence of non-infringing alternatives, Mr. Bone explains that Roll-Rite is entitled to capture at least 100% of all Shur-Co's 4500 Series sales because there were no non-infringing substitutes on the market. For the second factor, the critical question is not whether there were competing devices, but whether there were acceptable substitutes. *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986).

Mr. Bone begins by explaining that the entire tarp system market utilizes three types of systems: chain drive systems, worm gear systems, and spur gear assemblies—the latter is the type of system that uses Roll-Rite's gear motors. As to the first two types of systems, chain drive and worm gear, Mr. Bone notes that both systems were "less efficient and did not provide sufficient torque." Expert Report at 20. Mr. Bone explains that "chain drive systems are not an acceptable substitute to the patented technology because they are less reliable as the chain can come off the sprockets." *Id.* at 21. Further, the "chain drive systems have numerous components, which further reduces reliability as having more parts leads to a higher likelihood of failure." *Id.*

Worm gears systems are not an acceptable substitute either because "[i]n addition to lower efficiencies, worm gear technology typically has a lower output based on torque and speed making these systems less suitable for the larger truck bed or trailer application that do not require the power spur gear technology offers." *Id.* at 20. Accordingly, Mr. Bone concludes that chain drive systems and worm gear systems are not acceptable non-infringing substitutes to Roll-Rite's spur gear assemblies because of their disadvantages.

After explaining the advantages of spur gear assemblies, Mr. Bone concludes that "there were no spur gear direct drive actuator assemblies in the marketplace at the time of the first

infringement," and "[t]o my knowledge, I am not aware of a spur gear direct drive actuator currently on the market that does not infringe the '819 patent." *Id*. at 22. Consequently, he concludes that there were no non-infringing substitutes on the market.

Shur-Co does not propose any non-infringing alternatives except its own product, contending instead that Mr. Bone must take into account the advantages the 4500 Series has over the 3500 Series, which used Roll-Rite's gear motors. First, Shur-Co notes that the 3500 Series experienced significant difficulties when using Roll-Rite's gear motors: "Brakes and gear cases cracking. . . . Oh, motor melted." Kartes Dep. at 10; *see also* Mot. to Exclude, Ex. B (The Roll-Rite gear motors sold to Shur-Co had a failure rate that "equates to 4.4 times the return rate of the rest of the field."). Because of these difficulties, Shur-Co argues that it "had no choice but to abandon further use of the Roll-Rite gear motors and to go to market with a new tarp system, the 4500 Series." Mot. to Exclude 10. Shur-Co explains that its 4500 Series has several advantages over Roll-Rite's gear motors, including "the braking system does not need electricity to operate," and "it has fewer moving parts that are subject to failure . . . ." Knight Decl. ¶ 29-30.

Because of Roll-Rite's gear motor failure rate and the 4500 Series's advantages, Shur-Co contends that it was able to sell more of the 4500 Series than it would have sold of the 3500 Series, which used Roll-Rite's (allegedly inferior) gear motors. In other words, Shur-Co argues that the 4500 Series was a superior product and therefore sold better than the 3500 Series could have during the same period. Shur-Co then argues that Mr. Bone ignored this argument in his expert report, thereby failing to reconstruct the hypothetical market:

> Q:          Have you done an analysis to determine in the but-for world how many tarp systems Shur-Co would have sold had their tarp systems included the Roll-Rite Gear Motor?

> Mr. Bone:   To date, no.

- 14 -

Bone Dep. at 11.  Instead, Mr. Bone concluded that there were no acceptable non-infringing alternatives, and that Shur-Co's customers would have purchased a 3500 Series with Roll-Rite's gear motors in place of the 4500 Series.  Thus, Mr. Bone concludes that hypothetical sales of the 3500 Series would be equivalent to the actual sales of the 4500 Series, and that Roll-Rite is entitled to recover the profits of the gear motors that would have been used in the 3500 Series.

But the fact that an "infringer had to design or invent around the patented technology to develop an alleged substitute"—as Shur-Co claims to have done with the 4500 Series—weighs against a finding that there were adequate substitutes.  *Micro Chemical, Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1123 (Fed. Cir. 2003).  Therefore, Shur-Co's argument that it "had no choice" but to design the 4500 Series, Mot. to Exclude 10, thus supports Mr. Bone's conclusion that there were no acceptable non-infringing substitutes to Roll-Rite's gear motors.

Furthermore, Shur-Co's focus on the advantages of the 4500 Series ignores the Federal Circuit's guidelines on how to reconstruct the market:

> a fair and accurate reconstruction of the "but for" market also must take into account, where relevant, alternative actions the infringer would have undertaken had he not infringed.  Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner . . . Moreover, only by comparing the patented invention to its next-best available alternative(s) – regardless of whether the alternative(s) were actually produced and sold during the infringement – can the court discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward, had the infringer's activities not prevented him from taking full economic advantage of this right.  Thus, an accurate reconstruction of the hypothetical "but for" market takes into account any alternatives available to the infringer.

*Grain Processing*, 185 F.3d at 1350-51 (Fed. Cir. 1999) (emphasis added). Shur-Co has not provided any non-infringing alternatives to Roll-Rite's gear motors, as is its burden.  *Id.* at 1353. Shur-Co has not demonstrated that it could have chosen to use a non-infringing gear motor; instead, it appears to imply that it would have chosen to leave the market completely rather than

- 15 -

to continue buying gear motors from Roll-Rite.  *See* Mot. to Exclude 10 ("[G]iven the high rate of failure, Shur-Co had no choice but to abandon further use of the Roll-Rite gear motors . . . ."). Accordingly, Mr. Bone's testimony will not be excluded for claiming there were no non-infringing substititutes—or, in the words of Shur-Co, for failing to take into account the unique advantages of its infringing 4500 Series.

### c

Shur-Co does not dispute Mr. Bone's methodology concerning the third *Panduit* factor, manufacturing capacity.  Mr. Bone concluded that "Roll-Rite had the capacity to produce the lost sales of direct drive actuator assemblies what Shur-Co would have otherwise purchased from Roll-Rite but for infringement."  Expert Report at 25.  Mr. Bone explained that, because Shur-Co does not manufacture any other gear motors, Shur-Co would have to buy the gear motors from Roll-Rite if it had not developed the allegedly infringing 4500 Series.  *Id*. at 22-23.  Mr. Bone concluded that Roll-Rite could have met Shur-Co's demand for gear motors based on Roll-Rite production and manufacturing strategy.  *Id*. at 22.  Accordingly, Mr. Bone has established a prima facie case that Roll-Rite had the manufacturing capacity to meet the demand, and therefore has satisfied the third *Panduit* factor.

### d

*Panduit*'s fourth factor concerns the amount of profit the patentee would have made.  In his report, Mr. Bone concludes that "Roll-Rite lost profits on lost sales amounting to approximately $167 for each Super Duty and approximately $164 for each TarpStretcher lost in 2012 and approximately $153 for each Super Duty and approximately $150 for each TarpStretcher lost in 2013."  Expert Report at 25.  Mr. Bone reached this conclusion by determining the incremental profit Roll-Rite would have earned during the damages period.

"Incremental profit is the difference between the lost revenue and the additional costs that Roll-Rite would have incurred in order to generate those sales (i.e., incremental costs)." *Id.* at 25. Mr. Bone's incremental profit calculations took into account material costs, labor costs, variable overhead costs, warranty material costs, freight costs, working capital costs, and utility costs. *Id.* at 28-34. After determining the lost profits on each Super Duty and each TarpSTretcher, Mr. Bone planned to multiply the lost profits by the number of 4500 Series sold during the infringement period.

Shur-Co contends that Mr. Bone's report does not meet this factor because he has not explained why Roll-Rite would be entitled to claim 100% of Shur-Co's infringing sales. In essence, Shur-Co is repeating the argument it advanced concerning Panduit's second factor: that "Mr. Bone did not perform any analysis to reach his 100% (or higher) capture rate." Mot. to Exclude 14.

However, as addressed above, Mr. Bone explained that Roll-Rite's gear motors had no alternative non-infringing substitutes—and consequently, Mr. Bone concluded that Roll-Rite sold 100% of the spur gear motors. Roll-Rite does not dispute the contention that there were no non-infringing substitutes on the market. Accordingly, Mr. Bone concluded that Roll-Rite's hypothetical sales, absent infringement, would be equal to the 4500 Series actual sales.

**e**

Roll-Rite has proffered Mr. Bone's expert testimony, thereby demonstrating that it has, at least facially, met the four *Panduit* factors. Whether or not Mr. Bone's substantive analysis of those *Panduit* factors is correct is a question of fact to be determined by the jury. Accordingly, Mr. Bone's testimony regarding his alleged reconstruction of the market through satisfaction of the *Panduit* factors will not be excluded under Rule 702.

### iii

Shur-Co also contends that, because Mr. Bone did not offer an opinion on the number of gear motors Roll-Rite would have hypothetically sold, his damages report is incomplete. After noting his conclusions that Roll-Rite lost between $150.00 and $167.00 in lost profits on its gear motors, Mr. Bone "assumed that the damages period begins at the time the first infringing sales were made by Shur-Co, which was early 2012." Expert Report at 25. He then "calculated the lost profits on a per unit basis for 2012 and 2013 based on financial information received for 2012 and the first half of 2013, which is the final date for which I have revenue and cost information from Roll-Rite." *Id.* Instead of guessing the number of 4500 Series Shur-Co sold in the latter half of 2013, Mr. Bone elected to "reserve the right to update my analysis to include such information if and when the additional data is made available to me." *Id.* Because Mr. Bone, at the time he wrote his report, was unaware of the number of sales of the 4500 Series, he could not show how many gear motors Roll-Rite would have sold in place of the 4500 Series.

To prove damages, the patent owner's burden of proof is not absolute, "but rather one of reasonable probability." *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 653 (Fed. Cir. 1985). The measure of lost profits damages need only be a "reasonable approximation." *Id.* at 655. "The district court is free to use its discretion in choosing a method for calculating damages, as long as the measure of damages is just and reasonable." *Id.* at 653-54.

If actual damages cannot be ascertained with precision because the evidence available from the infringer is inadequate, damages may be estimated on the best available evidence, taking cognizance of the reason for the inadequacy of proof and resolving doubt against the infringer. *Kori Corp.*, 761 F.2d at 655, *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1571

(Fed. Cir. 1996).   In other words, in an infringement action, any risk of uncertainty in the calculation of a patent owner's lost profits is upon the infringer rather than upon the patent owner.  *Kori Corp.*, 761 F.2d at 655.

Shur-Co claims that without an explanation of how many gear motors Roll-Rite would have sold, Mr. Bone's damages calculation is incomplete.  But as Mr. Bone explained in his deposition, he could not provide a damages calculation because he did not yet have access to Shur-Co's sales data:

> Q:          And that's why you don't express an opinion on total damage amount in your report based on historical sales of gear motors to Shur-Co, correct?
>
> Mr. Bone:   Correct. We could have put something in there. It would have been an estimate . . . It was our understanding that that information—when I say "that information," information of the actual sales—was coming. And so I formulated my opinions based on the information we had to date, knowing that discovery was still open and there would be an opportunity to supplement.
>
> Q:          Okay. So you were relying on the ability of Roll-Rite to obtain actual sales numbers in order to express an opinion of total sales, total damages?
>
> Mr. Bone:   In general, that's correct.

Bone Dep. at 10.  Although Mr. Bone needed access to Shur-Co's sales information to develop a damages calculation, Roll-Rite did not request Shur-Co's sales information until September 6, 2013, seven days after Mr. Bone's expert report was due.  *Id.* at 10-11.

Mr. Bone explained that once he had Shur-Co's sales information, he would then multiply the number of sales by the unit profit to calculate Roll-Rite's lost profits:

> Q:          And so when you drafted your report, you contemplated just getting up on the stand, multiplying the per-unit gear motor profit times the number of accused sales, and that would be the total damages number; is that right?

- 19 -

Mr. Bone:       Based on what I knew, that was the expectation.

Bone Dep. at 15.  Mr. Bone later reiterated that he would take "the per-unit profit figures I have in my report and multiply it by the number of gear motors that Shur-Co bought from Groschopp, in my view, based on what I know today, I believe that is a reasonable calculation of Roll-Rite's lost profits."  *Id.* at 24.

Thus, although Mr. Bone did not include an estimate of the actual damages amount, he provided the methodology he intended to use to calculate lost profits: multiplying the per-unit gear motor profit by the number of gear motors Shur-Co bought from Groschopp, its manufacturer.  Although Shur-Co argues that "simple multiplication" is not a substitute for reconstructing the hypothetical market, Mr. Bone did reconstruct the hypothetical market by using the *Panduit* test, as explained above.

Mr. Bone's intended methodology of multiplying the per-unit gear motor profit by Shur-Co's 4500 Series sales would provide a reasonable approximation of Roll-Rite's lost profits. The parties do not explain whether Shur-Co subsequently provided the sales information to Mr. Bone. Even if Shur-Co did not, the Court must resolve doubts against the infringer.  *Sensonics*, 81 F.3d at 1572.  Accordingly, Mr. Bone's testimony will not be excluded for failing to include an estimate of the amount of lost-profit damages.

**iv**

Mr. Bone's use of the *Panduit* test and his proposed method of calculating the amount of lost profits is not so unreliable as to warrant exclusion under Rule 702.  Instead, Mr. Bone's testimony may be challenged through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . ."  *Daubert*, 509 U.S. at 595. Accordingly, Shur-Co's motion to exclude Mr. Bone's expert testimony will be denied.

- 20 -

**B**

Shur-Co has also filed a motion for summary judgment on Roll-Rite's claims for infringement and lost profits. Shur-Co asserts that Roll-Rite cannot prove infringement because Shur-Co's allegedly infringing device—the 4500 Series—does not meet each and every claim of the '819 patent. Moreover, Shur-Co continues, even if the 4500 Series is infringing, Roll-Rite is not entitled to lost profits because it cannot demonstrate that "but for" Shur-Co's infringement, it would have sold additional patented gear motors.

**i**

Summary judgment on the issue of infringement is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In other words, "[t]o support a summary judgment of noninfringement it must be shown that, on the correct claim construction, no reasonable jury could have found infringement on the undisputed facts or when all reasonable factual inferences are drawn in favor of the patentee." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1353 (Fed. Cir. 2001).

Summary judgment may not be granted when there are unresolved fact issues relating to the characteristics of the accused product that are relevant to determining whether the product meets the claim limitations. However, "[w]here the parties do not dispute any relevant facts regarding the accused product . . . but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment." *General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997).

**ii**

A patent is infringed when a person "without authority makes, uses, offers to sell or sells any patented invention, with the United States . . . during the term of the patent." 35 U.S.C. §

271(a).  "In order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device."  *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994).  Literal infringement occurs when each and every element of a claim is found to be literally present in an accused product.  *Riles v. Shell Exploration and Production Co.*, 298 F.3d 1302, 1308 (Fed. Cir. 2002).

Roll-Rite alleges that Shur-Co has infringed Claim 1, the only remaining independent claim in this case.[3]  Claim 1 requires that an infringing product have "a brake operatively connected to the electric motor for automatically braking the motor when the electric motor is turned off." '819 patent, col. 4, ln. 59.

In its motion for summary judgment, Shur-Co argues that Roll-Rite cannot prevail on a literal infringement claim on Claim 1 because it cannot demonstrate the presence of every element of Claim 1 in Shur-Co's 4500 Series.  First, Shur-Co asserts, the 4500 Series does not have a "brake" as defined by the claim construction order.  Second, the 4500 Series does not have "automatic braking."  Thus, Shur-Co contends, because not every element of Claim 1 is present in the 4500 Series, it is entitled to a summary determination that it did not infringe Roll-Rite's patent.

Even if Shur-Co is not entitled to summary judgment on the issue of infringement, it argues that it is entitled to summary judgment on the issue of damages.  Shur-Co asserts that Roll-Rite cannot recover lost profits damages because it cannot satisfy the first *Panduit* factor—demand for its patented product.  Although the Court already touched on this argument in its discussion of Mr. Bone's expert testimony, the Court will address Shur-Co's claim again in the context of a motion for summary judgment.

---

[3] Because Claim 8 is dependent on Claim 1, if Shur-Co did not infringe Claim 1, then it could not have infringed Claim 8.

**a**

Shur-Co first argues that it is entitled to summary judgment because its 4500 Series does not have a "brake" as defined by the claim construction.  In the claim construction order, this Court concluded that "brake" is "used in a non-technical, plain English way."  Claim Construction Op. & Order 23, ECF No. 29.  The Court declined to define the term "brake" in a way other than its ordinary meaning.  Claim Constr. 25.

To prove infringement, Roll-Rite must show that the 4500 Series has a brake as defined by the claim construction.  Shur-Co's argument focuses on part G of the 4500 Series, which Roll-Rite described as "a brake G" in its claim chart.  Ex. B.  Throughout its claim chart, Roll-Rite repeatedly refers to the "brake G" when referring to the part denoted by the letter "G."

Shur-Co contends that, despite Roll-Rite's designation of part G as a brake, it is not in fact a brake as defined by the claim construction order.  Shur-Co emphasizes the testimony of Mr. Bartell, a Roll-Rite Project Engineer.  During his deposition, Mr. Bartell was shown the claim chart Roll-Rite had prepared and sent to Shur-Co as part of this litigation.  When shown the part labeled "G", Mr. Bartell denied that part G was a brake:

Q:            You don't consider [part G] a brake?

Mr. Bartell:    No, it's a motor and frame.

Q:            Does item G have any braking function whatsoever?

Mr. Bartell:    No.

Bartell Dep. 19-20.  Mr. Bartell's testimony thus revealed that he did not believe that part G is a brake, despite Roll-Rite's contentions in its claim chart. Shur-Co argues that Mr. Bartell's admission means that Shur-Co cannot as a matter of law prevail on its infringement claim.

Roll-Rite does not dispute Mr. Bartell's conclusion and concedes that the part labeled "G" is not a brake. Roll-Rite instead explains that part G was erroneously labeled as a brake. Mr. Bartell testified to that erroneous label in his deposition:

> Q:          Okay. And is [part G] what you had identified to Roll-Rite management as being a brake?
>
> Mr. Bartell:   No.

Bartell Dep. 19. Roll-Rite thus contends that the 4500 Series has a brake—just not the part labeled G.

Roll-Rite contends that its unintentional mislabeling is irrelevant because the 4500 Series has a brake. In support of its claim that Shur-Co's 4500 Series has a brake, Roll-Rite refers to Shur-Co's patent and the testimony of its expert. In its patent, Shur-Co describes a "magnetic braking system" consisting of "a magnetic brake." Pl.'s Resp. to Mot. for Summ. J., Ex. 3. at 15. In addition, Shur-Co's retained infringement expert, Fred Smith, admits that the 4500 Series may have, at the least, some type of brake:

> Q:          My question's a little more broad than that. Does the Shur-Co 4500 Series motor have a brake?
>
> Mr. Smith:   I mean, it has what they have in their patent, and they call that a brake, but –
>
> Q:          You –
>
> Mr. Smith:   --but I don't want to be—that to be misconstrued because it's not the kind of brake that the patent requires.

Smith Dep. 61. Although Mr. Smith seemed hesitant to label any component a "brake," he admitted that the magnets perform a "braking action":

> Q:          So you'd agree with me that the permanent magnets of the Shur-Co motor perform a braking action.
>
> Mr. Smith:   Sure.

| Q: | And in the case of the Shur-Co motor, the braking action is supplied by a magnetic force; is that correct? |
| --- | --- |
| Mr. Smith: | Well, there's—there's a couple of ways that it's provided. It's provided by a magnetic force, and it's also provided by the – the ferrous material cutting through magnetic lines of action. |
| Q: | In the Shur-Co 4500 Series motor, what is the purpose of the braking action? |
| Mr. Smith: | Primarily it's to hold it in place when the – after the rotation has stopped. |

*Id*. at 63.

Although Shur-Co correctly contends that part G is not a brake, this admission is insufficient to award a summary judgment of non-infringement.  Looking beyond the mislabeled part G, Roll-Rite has produced sufficient evidence to show that there is a question of fact whether the 4500 Series has a "brake."

In response, Shur-Co contends that Roll-Rite should not be allowed to "change its theory of infringement" at this point in the litigation because it was unreasonable for Roll-Rite to make such a significant typographical error.  Shur-Co asserts that it would suffer prejudice if Roll-Rite was allowed to proceed because it was not put on notice of Roll-Rite's claim.

Although Roll-Rite's mislabeling of part G is regrettable, Shur-Co had sufficient notice that Roll-Rite intended to claim that the 4500 Series's permanent magnets acted as a brake.  The Court's Claim Construction Opinion requires only that the allegedly infringing device have a "brake" under the ordinary meaning of the word.  And Roll-Rite's expert, Mr. Bartell, brought the mislabeling to Shur-Co's attention during his deposition:

| Q: | Okay. And is [part G] what you had identified to Roll-Rite management as being a brake? |
| --- | --- |
| Mr. Bartell: | No. |

- 25 -

Bartell Dep. 19.[4]  Shur-Co appeared to summarize Mr. Bartell's testimony later in the deposition: "So, what's shown as G in figure 3, is in fact not consistent. It's inconsistent with the views you had expressed to management prior to filing a complaint, correct?"[5]  Bartell Dep. 21. Nevertheless, Mr. Bartell believed that Shur-Co's product had a brake as required by the claim contruction:

> Q:          Okay. Now, is it your view that all the elements of column—I'm sorry—of claim one are met by the Shur-Co product?
>
> Mr. Bartell:   Yes.

Bartell Dep. 14.

In sum, Shur-Co had notice that Roll-Rite needed to prove the 4500 Series had a brake, and that Roll-Rite's claim construction charts contained a labeling error.  Moreover, Shur-Co's own expert witnesses testified that the 4500 Series performed a "braking function," which would give it notice of Roll-Rite's possible brake claims.

Despite its mislabeling, Roll-Rite has provided sufficient evidence of the existence of a brake in the 4500 Series to survive a motion for summary judgment.

**b**

Shur-Co next contends that its 4500 Series does not have an "automatic brake" as required by the claim constructions.  Claim 1 requires "a brake operatively connected to the electric motor for automatically braking the motor when the electric motor is turned off." Mot. Summ. J. Ex. 1.  As noted above, there is a genuine issue of material fact regarding whether the 4500 Series contains a brake, let alone a brake for automatic braking.  If a jury concludes that the

---

[4] Roll-Rite also claims that Mr. Bartell then "went on to describe what was the brake, how it functioned, the testing he did, and his opinion that the Shur-Co brake met the limitation of the claims of the 819 Patent as construed by this Court." However, neither Roll-Rite nor Shur-Co provided those excerpts of Mr. Bartell's testimony to verify that statement.
[5] The parties did not provide Mr. Bartell's answer to this question in the deposition transcripts.

4500 Series does not have a brake, then the question of whether there is automatic braking is moot. However, for the purposes of Shur-Co.'s motion for summary judgment, the Court will assume that the 4500 Series has a brake.

Shur-Co's automatic braking claim involves, in effect, a dispute concerning the meaning of Claim 1. Because Shur-Co is challenging the meaning of Claim 1, the Court's decision is necessarily driven by its earlier conclusion in its claim construction. In its claim construction opinion, the Court divided Claim 1 into two components: "a brake operatively connected to the electric motor," and "for automatically braking the motor when the electric motor is turned off." The Court addressed the meaning of each component separately.

Regarding the first component—"a brake operatively connected to the electric motor"—the Court rejected both parties' proposed definitions. In rejecting Shur-Co's proposed definition, the Court noted that it "offers both too little description and too much." Claim Constr. at 29. Shur-Co had proposed that the first component be defined to mean "the brake is energized when the motor is energized, and the brake is de-energized when the motor is de-energized." *Id.* The Court rejected this proposed definition because it "does not describe the brake's function (i.e., braking the motor)." *Id.* Thus, the definition of "brake" necessarily requires attention to a brake's function. Accordingly, the Court determined that the first component would be defined to mean "a brake arranged in a matter that is capable of braking the motor," which took into consideration the brake's function. *Id.* at 30.

Regarding the second component of Claim 1—requiring a brake "for automatically braking the motor when the motor is turned off"—the Court adopted the parties' proposed definition. The second component is thus defined as meaning "the brake is off when power is

supplied to the motor, and the brake is on when power is not supplied to the motor." *Id.* at 36. This second component is at the heart of Shur-Co's motion for summary judgment.

In its motion, Shur-Co argues that the 4500 Series does not have automatic braking because it "does not have a brake that switches between on and off states" as required by the second component of Claim 1. Def.'s Mot. Summ. J. 10. Shur-Co explains that the 4500 Series utilizes "permanent magnets to produce a magnetic field that is always on." *Id*. Furthermore, to effect the function of the brake (i.e., turning off the motor), the magnetic field's resistance . . . must be overcome." *Id*. at 16. Thus, it argues, the brake is always "on" because the magnetic field exists at all times. Accordingly, because the second component requires a brake that can be both on and off, the 4500 Series does not literally infringe Roll-Rite's product.

Shur-Co's argument conflates the braking method with the braking function. A brake's function is to stop the spool from spinning; therefore, a brake is on when it has stopped the spool, and the brake is off when it allows the spool to spin. Shur-Co's argument, however, focuses on the method the brake uses to effect this function. It argues that the magnetic field always exists, and therefore the brake is always on.

But, this argument does not make logical sense given the claim construction. The focus should not be on the question of whether electricity is being supplied to a motor or whether there is a magnetic field. Instead, the relevant question is whether the brake is achieving its intended function: preventing the tarp spool from spinning. The magnetic field, which continually exists, allows the 4500 Series's brake to prevent the tarp spool from spinning. If, as Shur-Co's argues, the 4500 Series's brake was always on (i.e., always preventing the tarp spool from spinning), it would not perform its primary function—winding and unwinding the tarp spool. Shur-Co's focus on the braking method is thus incorrect. Instead, the focus is on whether the brake is

effecting its intended function—stopping the tarp spool from turning. This focus is reflected in the Court's claim construction opinion, which clarified that a definition for "brake" necessarily requires consideration of a brake's function. *See* Op. & Order at 29 (rejecting Defendant's proposal because it "does not describe the brake's function (i.e., braking the motor)").

Shur-Co's automatic braking argument attempts to present a claim definition that focuses on the braking method (the magnetic field) rather than the brake's function (stopping the motor)—a focus rejected by this Court's claim construction opinion. Accordingly, Shur-Co's automatic braking argument will be rejected.

**c**

In addition to seeking summary judgment on Roll-Rite's infringement claims, Shur-Co also seeks summary judgment on the issue of damages. That is, assuming that Roll-Rite can prove infringement, Shur-Co claims that Roll-Rite is not entitled to lost profits.

The patent statute provides that a patent owner who proves infringement is entitled to damages, which may include lost profits:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.

35 U.S.C. § 284. If the patent owner can prove that the infringement caused the patent owner to lose profits that it otherwise would have made, then the patent owner may recover its lost profits. The patent owner bears the burden of proving to a reasonable probability that it would have made additional profit but for the infringement. *Standard Havens Products, Inc. v. Gencor Industries, Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991).

However, the patent owner is not required to prove the causal relationship between the infringement and its lost profits with "absolute certainty." *Standard Havens*, 953 F.2d at 1372.

- 29 -

Courts recognize that the determination of damages "is not an exact science," and, therefore, "the amount need not be proven with unerring precision." *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1327 (Fed. Cir. 1987).

Furthermore, the patent owner is not required to negate "every possibility" that the purchaser might not have purchased a product other than the patent owner's. *Rite-Hite*, 56 F.3d at 1545-46. Instead, the patent owner need only show that there was a reasonable probability that the sales would have been made, "but for" the infringement. *Id*. Indeed, "when the patent owner and infringers were the only suppliers of the patented product, it is reasonable to infer that the patent owner would have made the sales made by the infringer." *Del Mar*, 836 F.2d at 1327.

Here, Shur-Co contends Roll-Rite cannot make a claim for lost profits because Roll-Rite did not sell a patented product. Shur-Co explains that Roll-Rite's patent covers a gear motor's *use* in a tarp spool, not the gear motor itself. According to Shur-Co, because Roll-Rite cannot show demand for a *patented product*, it cannot satisfy *Panduit*'s demand requirement.

But the Federal Circuit does not construe *Panduit*'s first factor so narrowly. "[T]he first *Panduit* factor simply asks whether demand existed for the 'patented product,' i.e., a product that is 'covered by the patent in suit' or that 'directly competes with the infringing device.'" *DePuy*, 567 F.3d at 1330. Although Roll-Rite's gear motors are not patented, their use in tarp spool systems is. And it is this patented use that competes with Shur-Co's allegedly infringing 4500 Series.

Even if Roll-Rite could not meet *Panduit*'s demand factor, *Panduit* is not the exclusive method for establishing "but for" causation in determining lost profits. *See Rite-Hite*, 56 F.3d at 1545 (calling *Panduit* test "a useful, but non-exclusive, way for a patentee to prove entitlement to lost profits damages."). Indeed, Shur-Co's argument—that Roll-Rite cannot recover lost

profits because it doesn't sell a patented item—ignores the underlying objective of § 284. According to the Supreme Court, "Congress intended in § 284 that a 'patent owner would in fact receive full compensation for any damages [the patent owner] suffered as a result of the infringement.'" *Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004) (quoting *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654 (1983)).

The Federal Circuit has held that a "patent owner who has suffered lost profits is entitled to lost profits damages regardless of whether the patent owner has made, used, or sold the patented device." *Rite-Hite*, 56 F.3d at 1548. Thus, the Federal Circuit has not required a patent owner to sell the patented product before the patent owner can recover lost profits from an infringer.

The reasoning underlying *Rite-Hite* is instructive and supports the conclusion that Roll-Rite should be allowed to present evidence that it lost money because of Shur-Co's Series 4500 products. In *Rite-Hite*, the court noted that "the language of the statute is expansive rather than limiting." 56 F.3d at 1544. The court continued:

> the Supreme Court has interpreted [§ 284] to mean that "adequate" damages should approximate those damages that will fully compensate the patentee for infringement. Further, the Court has cautioned against imposing limitations on patent infringement damages, stating: "When Congress wished to limit an element of recovery in a patent infringement action, it said so explicitly."

*Id.* at 1545 (quoting *General Motors*, 461 U.S. at 653) (emphasis in original).

Similarly, in *King Instruments v. Perego*, the Federal Circuit held that the "broad language [of § 284] awards damages for an injury as long as it resulted from the infringement. . . . [I]t mandates an amount 'adequate to compensate for the infringement.'" 65 F.3d at 947 (quoting 35 U.S.C. § 284). Thus, "[a]s long as the patentee receives a proper economic return on

its investment in the acquisition of a patent, the Act does not require that return to come from the sale of patented products." *Id.* at 950.

Instead of focusing on whether a company lost sales of a patented product, the Federal Circuit established a foreseeability test to guide courts. In *Rite-Hite*, the patent owner manufactured a patented device and an unpatented device. 56 F.3d at 1549. The patent owner sued the defendant for infringement of the patented device. The patent owner also claimed that the defendant's infringing device caused the patent owner to lose sales of both the patented and unpatented devices. The patent owner therefore sought lost profits damages on the lost sales of the patented and unpatented devices.

The Federal Circuit held that lost profits were recoverable because the lost sales on the unpatented device were reasonably foreseeable. *Id.* at 1548-49. The *Rite-Hite* court explained that to recover damages a claimant must establish both "but for" causation and legal causation, i.e., foreseeability:

> Being responsible for lost sales of a competitive product is surely foreseeable; such losses constitute the full compensation set forth by Congress, as interpreted by the Supreme Court, while staying well within the traditional meaning of proximate cause. Such lost sales should therefore *clearly* be compensable.

*Id.* at 1546 (emphasis added).

Here, Shur-Co's allegedly infringing device is directly competitive with Roll-Rite's patented use. Accordingly, precluding Roll-Rite from claiming damages simply because it patented the use of a product, rather than a product itself, would undermine the purpose of § 284. Roll-Rite claims that it lost profits because, when Shur-Co manufactured the 4500 series, it no longer purchased Roll-Rite's gear motors for use in its 3500 Series. Thus, it is reasonably foreseeable that Roll-Rite would lose sales on its gear motors when Shur-Co began manufacturing the 4500 Series—indeed, part of the purpose of designing the 4500 series was so

- 32 -

that Shur-Co would not have to purchase Roll-Rite's gear motors.  *See* Kartes Dep. 92; Pl.'s Resp. to Mot. to Exclude, Ex. 8.

In short, Shur-Co is not entitled to summary judgment on the issue of lost profits.  As the amount of Roll-Rite's damages is a question of fact, it is for the jury to determine how much, if anything, Roll-Rite is entitled to recover.

### III

Accordingly, it is **ORDERED** that Shur-Co's Motion to Exclude the Report and Testimony of John Bone (ECF No. 37) is **DENIED**.

It is further **ORDERED** that Shur-Co's Motion for Summary Judgment (ECF No. 35) is **DENIED**.

It is further **ORDERED** that any motions in limine should be filed on or before **September 15, 2014**.

It is further **ORDERED** that the parties' Final Pretrial Order is due on or before **September 29, 2014**.

It is further **ORDERED** that the Joint Final Pretrial Conference is now set for **October 7, 2014 at 3:00 p.m.**

It is further **ORDERED** that the jury trial is now set to begin on **October 21, 2014 at 8:30 a.m.**

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: May 29, 2014

- 33 -

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 29, 2014.

s/Tracy A. Jacobs
TRACY A. JACOBS